## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXUS BENNETT, | : | |
| ALIYAHA BENNETT, and | : | CIVIL ACTION |
| PRISCILLA BENNETT, Minors, | : | |
| by and through their Guardian, | : | |
| JONATHAN IRVINE, | : | |
| Plaintiffs, | : | No. 03-5685 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| Defendant. | : | |
| _____ | : | |
| | : | |
| THE ESTATE OF PORCHIA | : | |
| BENNETT, Decedent, by and through | : | CIVIL ACTION |
| the Administrator of the Estate, | : | |
| THOMAS BRUNO, ESQ., | : | |
| Plaintiff, | : | No. 05-0833 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA and | : | |
| JOE MAIDEN, | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**Schiller, J.**                                                                 **May 17, 2006**

These cases have caused this Court great anguish as they recount the tragedy of four young

sisters who were neglected and abused, with the youngest starved and beaten to death at age three.

Plaintiffs Alexus, Aliyaha and Priscilla Bennett are three minor sisters who allege that the City of

Philadelphia ("the City") violated their constitutional rights by obtaining discharge of the Bennett

file at the Department of Human Services ("DHS") through misrepresentation.  Plaintiffs claim that

because the DHS file was discharged the Bennett sisters remained in their unfit mother's custody and

were abused by unsuitable care givers.  The abuse culminated in the death of a fourth sister, Porchia

Bennett.  Plaintiff Estate of Porchia Bennett ("the Estate") alleges that the City and DHS social

worker Joe Maiden violated Porchia's constitutional rights by failing to respond properly to a hotline report of the Bennett children's abuse. The Estate also brings a claim against the City based on closure of the Bennett DHS file.

Presently before the Court are Defendants' motions for summary judgment on all claims in these consolidated cases. The law is clear: a constitutional violation arises under the state-created danger doctrine only when state actors affirmatively use their authority in a way that creates a danger or renders a citizen more vulnerable to danger than had the state not acted at all. Because this requirement is not satisfied here, Plaintiffs' § 1983 claims fail as a matter of law. Accordingly, the Court grants Defendants' motions for summary judgment.

## I.    BACKGROUND

### A.    Factual Background[1]

The mission of DHS is "to protect children from abuse [and] neglect, [ ] to ensure their safety [ ] in nurturing home environments," and to "implement[ ] policies and programs to continuously improve, measure and achieve positive outcomes for children." DHS Web site, http://dhs.phila.gov/intranet/pgintrahome_pub.nsf (last visited May 11, 2006). DHS was involved in the lives of Tiffany Bennett and her children for nearly a decade.

### 1.    DHS' Initial Involvement with Tiffany Bennett

Tiffany Bennett had five daughters: Alexus (born January 9, 1993), Iyonnah (born October 29, 1994), Aliyaha (born October 3, 1996), Priscilla (born January 12, 1999) and Porchia (born July 7, 2000). (Pls.' Alexus, Aliyaha and Priscilla Bennett's Mem. of Law in Opp'n to Def. City's Mot.

---

[1] The following facts are undisputed unless otherwise noted.

for Summ. J. [hereinafter Pls.' Mem.] Ex. 58 (Birth Certificates).)  In December 1994, Iyonnah suffered brain injuries from being shaken while in the care of a babysitter.  (Pls.' Mem. Ex. 1 (Hughes Report) at 1.)  A DHS investigation concluded that Tiffany Bennett and Oliver Bynum, Jr., the father of Iyonnah and Alexus, were "perpetrators by omission," and therefore Iyonnah was permanently placed with an adoptive family.  (*Id*. at 2.)  Tiffany Bennett and Oliver Bynum, Jr. subsequently separated.  (*Id*.)

### 2.    DHS Supervision Ordered for Alexus and Aliyaha

In 1997, DHS determined that Tiffany Bennett, a substance abuser who did not provide her children with necessary medical attention, posed a risk of serious harm to her children.  (*Id*. & Pls.' Mem. Ex. 13 (Lutheran Children & Family Service Report, Apr. 14, 1997 - May 14, 1997).)  Tiffany Bennett compounded this risk by actively avoiding contact with DHS.  (Pls.' Mem. Ex. 1 at 2.)  On May 30, 1997, DHS petitioned family court to rule Alexus and Aliyaha dependent children because Tiffany Bennett was not cooperating with DHS in implementing a plan for their care.[2]  (*Id*. & Pls.' Mem. Ex. 19 (Dependent Pet. for Alexus Bennett, Aug. 25, 2003) at 7f-g.)  On June 4, 1997, the family court deferred adjudication of dependency but ordered DHS supervision of Alexus and Aliyaha.  (Pls.' Mem. Ex. 1 at 2 & Ex. 19 at 7f-g.)  In December 1997, the family court learned Alexus was living in North Carolina with her father and ordered DHS to assess her situation.  (Pls.'

---

[2] A dependant child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk . . . .

42 PA. CONS. STAT. § 6302 (2005).  A court can temporarily or permanently take legal custody of a dependant child away from a parent.  *See* 42 PA. CONS. STAT. § 6351.

Mem. Ex. 19 at 7k.)  The North Carolina Department of Social Services visited Alexus in her new home and provided DHS with a positive report.  (*Id*. at 7n.)  The family court then discharged Alexus' dependency petition on February 19, 1998.  (*Id*.)

In July 1998, Aliyaha was temporarily committed to DHS and placed in foster care for two days because Tiffany Bennett was expelled from the shelter where they had been living.  (Pls.' Mem. Ex. 1 at 3 & Ex. 19 at 7p.)  The family court returned Aliyaha to her mother and ordered Tiffany Bennett to enter another shelter, undergo a mental health evaluation, and cooperate with DHS.  (Pls.' Mem. Ex. 1 at 3 & Ex. 19 at 7q.)  Tiffany Bennett and Aliyaha lived at the Salvation Army Shelter from August 1998 until May 1999.  (Pls.' Mem. Ex. 1 at 3.)  During that stay, Priscilla was born on January 12, 1999.  (Pls.' Mem. Ex. 58.)

### 3.    Bennetts Leave the Shelter & DHS Conducts a Search

On May 10, 1999, Tiffany Bennett left the Salvation Army Shelter with Priscilla and Aliyaha. (Pls.' Mem. Ex. 7 (DHS Bennett Case Progress Records).)  Two days later, DHS social worker Yolanda Grant learned of Tiffany Bennett's unauthorized departure from the shelter.  (*Id*.)  On June 1, 1999, Grant checked the Department of Public Administration's ("DPA") computer records and discovered that  Tiffany Bennett's DPA benefits were still being sent to the Salvation Army Shelter. (*Id*.)  In an effort to locate Tiffany Bennett, Grant spoke with a DPA representative who confirmed that Bennett's benefits would be terminated on June 10, 1999, and that if Tiffany Bennett contacted DPA for benefit reinstatement she would be told she must first contact DHS.  (*Id*.)  However, when Tiffany Bennett sought benefit reinstatement, DPA allowed her to reinstate her benefits without contacting DHS.  (Pls.' Mem. Ex. 1 at 4.)  Grant made several other efforts to locate Tiffany Bennett, including: (1) contacting Priscilla's pediatrician; (2) visiting a former address at West Master Street;

(3) speaking with Adiam Debesai, a social worker who had worked with Tiffany Bennett at the Salvation Army Shelter and who had spoken with Tiffany Bennett's mother, Dale Geiger; and (4) trying to contact Dale Geiger and Alexus' father by telephone.  (Pls.' Mem. Ex. 7.)

On September 14, 1999, DHS petitioned family court to discharge DHS supervision and the dependency petition for Aliyaha.  (Pls.' Mem. Ex. 10 (Tr. of Family Ct. Hr'g).)  At the hearing, the child advocate objected based on concern for Aliyaha's safety.  (*Id.* at 4.)  Judge James Murray Lynn refused to terminate DHS' involvement and stated, "I don't want [this case] just sitting on a desk somewhere.  I want to see work done.  I want people to continue to look . . . . I want DHS to vigilantly look for the baby [Aliyaha].  When they get the baby, I want them to take the baby." (*Id.* at 8-9.)

By early 1999, Alexus and her father had returned to Philadelphia, where Alexus attended public school.  (Pls.' Mem. Ex. 19 at 7r & Ex. 42 (Oliver Bynum, Jr. Dep.) at 28, 38.)  She lived with her paternal grandfather for a period of time, before returning to her mother's control.[3]  (Pls.' Mem. Ex. 40 (Dale Geiger Dep.) at 28 & Ex. 43 (Oliver Bynum, Sr. Dep.) at 13-14, 55.)  In March 2003, Tiffany Bennett directed Alexus' school not to permit contact between Alexus and her grandfather. (Pls.' Mem. Ex. 43 at 36-39; City's Mem. Ex. N (Tiffany Bennett's note to school).)

### 4.    Bennett Case Reassigned & Discharged

In November 1999, the Bennett DHS case was reassigned to social worker Iris Dejesus. (Pls.' Mem. Ex. 8 (Dejesus' Progress Notes).)  On the case assignment sheet, social work supervisor

---

[3] The length of time Alexus lived primarily with her paternal grandfather is in dispute. (*Compare* Pls.' Mem. at 23 ("Alexus Bennett began living with her mother soon after Tiffany left the shelter [in May 1999].") *with* Def. City's Mem. of Law in Supp. of Mot. for Summ J. [hereinafter City's Mem.] at 8 ("From May 1999 until March 2003, Alexus was safe and happy with her grandfather.").)  However, the Court finds this is not a material fact.

Patricia Wilson wrote, "If you cannot locate family by Nov. 14 [1999] request an early listing for discharge of this case, again, as floater SW [social worker] did.  If you do locate family, J.Lynn made an order to take Aliyaha into DHS custody!!!"  (Pls.' Mem. Ex. 9 (Case Assignment Sheet).) Dejesus did not try to locate the Bennetts until late March of 2000.  (Pls.' Mem. Ex. 8 & Ex. 34 (Iris Dejesus Dep.) at 49-50.)  On March 27, 2000, Dejesus sent search letters to the Department of Public Welfare and to the Office of Services to the Homeless and Adults.  (Pls.' Mem. Ex. 15 (Search Letters).)  On April 17, 2000, Dejesus checked DPA's computer records and learned that Tiffany Bennett was receiving DPA benefits at a Grandsback Street address in Philadelphia.  (Pls.' Mem. Ex. 8 & Ex. 34 at 53.)  That same day, Dejesus visited the Grandsback Street address, but the house appeared abandoned.  (Pls.' Mem. Ex. 8 & Ex. 34 at 53.)

On April 18, 2000, DHS again petitioned family court to discharge DHS supervision and Aliyaha's dependency petition because the "family is unable to be located."  (Pls.' Mem. Ex. 11 (Tr. of Family Ct. Hr'g) at 3.)  The child advocate did not object, and DHS supervision and the dependency petition were discharged by agreement.  (*Id.*)

### 5.     Abuse and Tragedy Befall the Bennett Sisters

In late 1999, Tiffany Bennett and her daughters began living periodically with Dale Geiger. (Pls.' Mem. Ex. 39 (Bridgette Bennett Dep.) at 19, 33 & Ex. 40 at 27-28, 31.)  Porchia was born on July 7, 2000.  (Pls.' Mem. Ex. 58.)  The Bennett sisters were exposed to unsuitable, unstable living conditions and to unfit care givers.  (Pls.' Mem. at 24-25.)  For example, Jayson Chambers, a convicted child sex offender, was a babysitter for the Bennett sisters.  (Pls.' Mem. Ex. 40 at 46-47, Ex. 23 (Alexus' School Health Log) at 6 & Ex. 27 (State Police Megan's Law Web Page Listing for Jayson Chambers).)  Beginning in the fall of 2002, Tiffany Bennett paid Jerry Chambers, who

suffered from a schizoaffective bipolar type disorder and a history of drug and alcohol abuse, fifty to eighty dollars per week to look after her children. (Pls.' Mem. Ex. 30 (Psychiatric Evaluation of Jerry Chambers, Aug. 2, 2002) & Ex. 41 (Ruthann Leonard Dep.) at 40, 54.) With rare visits from their mother, the four Bennett sisters lived with Jerry Chambers and his girlfriend, Candace Geiger, who was Tiffany Bennett's younger sister. (Pls.' Mem. Ex. 41 at 41, 46, 57-58, 79.)

Through its telephone hotline, DHS received a report at 7:25 p.m. on August 14, 2003 that Jerry Chambers beat the Bennett sisters.[4] (City's Mem. Ex. Q.) The hotline report was classified as a General Protective Services report, which applies to allegations of neglect, and a DHS social worker was required to respond within twenty-four hours. (City's Mem. at 12-13 & Ex. Q.) During the morning of August 15, 2003, DHS social worker Joe Maiden was assigned to investigate the hotline report. (Estate's Mem. Ex. P2 (Theresa O'Donnell's Email to Alba Martinez Re: Maiden, Aug. 21, 2003); City's Mem. Ex. R (Maiden's Progress Notes).) Maiden reported that he visited the Bennett sisters' home twice on August 16, 2003, leaving a note at the first visit, and once on August 17, 2003, but he never got a response at the door. (City's Mem. Ex. R.) The facts surrounding Maiden's response to the hotline report are disputed, but the parties agree that Maiden did not

---

[4] The DHS Report Referral Data Narrative, which refers to Chambers as "Smokie," reads:

RFRL REPORTER ALLEGED THAT "SMOKIE" (FAT) BEATS THE CHILDREN LIKE THEY ARE MEN. ACCORDING TO THE REPORTER FAT HANDS ARE SWOLLEN FROM BEATING ON THE CHILDREN. FAT MAKES THE GIRLS STAY IN THE HOUSE ALL THE TIME. REPORTER STATED THAT RECENTLY SHE SAW THE OLDEST GIRL COME TO THE DOOR AND SHE HAD A SWOLLEN EYE. HOWEVER, REPORTER HAS NEVER SEEN OR HEARD THE CHILDREN BEING BEAT.

(City's Mem. Ex. Q (City Report Referral Data, Aug. 14, 2003).)

respond as he reported in his case progress notes.[5]

On August 17, 2003 at approximately 1p.m., emergency personnel rushed a brutally beaten Porchia to a hospital, where she was pronounced dead shortly after arrival.  (Pls.' Mem. Ex. 19 at 7z.)  Alexus described the events leading to Porchia's death as follows.

> SHE STATED THAT ON SATURDAY PORTIA [sic] GOT A BEATING FROM
> JERRY WITH AN EXTENSION CORD.  SHE STATED THAT PORTIA'S [sic]
> WOUNDS WERE SO SEVERE THAT SHE COULD NOT LAY DOWN AND GO TO
> SLEEP.  JERRY BEAT HER AGAIN FOR MAKING NOISE.  HE PICKED HER UP
> AND SLAMMED HER TO THE FLOOR IN THE CORNER.  HE TOLD HER TO
> STAND UP IN THE CORNER ALL NIGHT BUT THE SLAM TO THE FLOOR HAD
> INJURED HER LEG AND SHE COULD NOT STAND UP.  HE THEN CHOKED
> AND KICKED HER.  SHE STATED THAT THEY ALL WENT TO SLEEP AND IN
> THE MORNING THEY FOUND PORTIS [sic] WEDGED BETWEEN THE
> MATTRESS AND THE RADIATOR.  "WE COULD NOT WAKE HER."

(City's Mem. Ex. R.)  Porchia's cause of death was listed as multiple blunt trauma, asphyxia and inanition.[6]  (Pls.' Mem. Ex. 28 (Autopsy Report).)  Porchia's autopsy revealed malnourishment, laceration of the liver, "[m]ultiple blunt force injuries to the head, chest, abdomen, back and extremities," and "[m]ultiple scars and healing injuries of varying ages from past episodes of blunt

---

[5] The Estate contends Maiden never went to the Bennett sisters' home.  (Estate's Mem. of Law in Opp'n to City's Mot. for Summ. J. [hereinafter Estate's Mem.] at 11.)  Supporting this contention, the City states, "DHS' subsequent investigation into the events of August 14-16, 2003, cast [sic] significant doubt on the truth of Maiden's representations that he visited the home three times that weekend."  (City's Mem. at 9 n.6.)  Although Maiden's brief implies that he took action in response to the hotline report, at oral argument his attorney conceded, "[T]he fact is that Mr. Maiden was assigned the - this job to go out and see the Bennetts.  He was - - he - - he probably failed to - - to go out there.  And that's not in dispute . . . ."  (R. at 12, Mar. 23, 2006; Maiden's Mem. in Supp. of Mot. for Summ. J. [hereinafter Maiden's Mem.] at 2.)

[6] Inanition "covers not getting enough food; or in very stressed infants, even if they get enough food and they are forced to digest it, they just don't derive any nourishment from it.  It's a peculiar condition, well recognized in neglected and abused infants and children."  (Pls.' Mem. Ex. 52 (Dr. Ian Hood Criminal Trial Test.) at 41.)  Young children "have to receive emotional support and feel safe; and when they don't, you tend to see this phenomena of wasting away.  We call that inanition, for want of a better term."  (*Id*. at 61-62.)

force injuries to head, trunk and extremities." (*Id.*)  Alexus, Aliyaha and Priscilla were admitted to the Children's Hospital of Philadelphia ("CHOP"), and they were given admission and discharge diagnoses of child abuse.  (Pls.' Mem. at 31.)  Alexus had facial injuries, a fractured eye socket, bruised and swollen eyes, scabbed-over back lesions, and scars on her buttocks.  (Pls.' Mem. Ex. 59 (Alexus' CHOP Discharge Summ.).)  Aliyaha and Priscilla also had scars, lesions, and bruises. (Pls.' Mem. Ex. 60 (Aliyaha's CHOP Discharge Summ.) & Ex. 61 (Priscilla's CHOP Discharge Summ.).)

### 7.     The Fallout from the Bennett Sisters' Tragedy

In relation to Porchia's death, Jerry Chambers was convicted of first-degree murder and sentenced to death and seventy-three to one hundred forty-six years in prison. (*See* Theresa Conroy, *Porchia's Aunt Gets 17-34 Years*, PHILADELPHIA DAILY NEWS, Nov. 11, 2005, at 4.)  Candace Geiger was convicted of third- degree murder and sentenced to seventeen to thirty-four years in prison.  (*Id.*)  Tiffany Bennett was convicted of conspiracy and endangering the welfare of her children, and she was sentenced to twenty to forty years in prison. (*See* Theresa Conroy, *Jury Weighing Fate of Porchia's Killer*, PHILADELPHIA DAILY NEWS, May 26, 2005, at 12.)

A DHS Employee Violation Report was filed on Maiden for his activities related to the Bennett hotline report. (City's Mem. Ex. S (Maiden's Violation Report, Sept. 11, 2003).)  The report stated that Maiden was being disciplined for failing to make reasonable efforts to access the Bennetts' home, for failing to notify his supervisors that he did not make the required home visit within twenty-four hours, and for making false and misleading representations regarding his response to the hotline report. (*Id.*)  Maiden resigned before DHS could proceed with its disciplinary process. (R. at 10-11.)

9

Since August 2003, Alexus, Aliyaha and Priscilla have required a variety of mental health services, and they remain severely traumatized.  (Pls.' Mem. Ex. 3 (Expert Report of Children's Crisis Treatment Center, Dec. 19, 2005).)

### B.    Procedural Background

Plaintiffs Alexus, Aliyaha and Priscilla Bennett filed a Complaint in October 2003, bringing 42 U.S.C. § 1983 claims under the special relationship and state-created danger doctrines against the City, DHS and its Director, and social workers Dejesus, Grant and Wilson.  (*See* Compl.)  In addition to damages, Plaintiffs seek an injunction requiring the City to create and enforce effective procedures for locating children missing from DHS' care.  (*Id*. at ¶ 56.)  Defendants filed a motion to dismiss, and the Court held that Plaintiffs' state-created danger claims survived.[7]  (Mem. & Order at 10, Dec. 18, 2003 .)  The City filed a motion for reconsideration, arguing that *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), bars Plaintiffs' state-created danger claims.  (*See* City's Mem. of Law in Supp. of Defs.' Mot. for Recons. or § 1292(b) Certification.)  In denying the motion for reconsideration, the Court stressed "that no liability has been found in this case, nor is the factual record sufficiently developed for any court, trial or appellate, to make a determination of liability at this time."  (Mem. & Order, Jan. 26, 2004.)

In August 2004, the Bennett sisters' case was placed in civil suspense pending the resolution of related criminal proceedings.  (Stipulation & Order, Aug. 17, 2004.)  The Estate filed an action

---

[7] The Court dismissed Plaintiffs' special relationship claims because the facts did not allege physical custody by the government.  (Mem. & Order at 12, Dec. 18, 2003.)  Also, the Court dismissed the individual social workers based on qualified immunity and DHS because it is not a separate legal entity from the City.  (*Id*. at 4-5.)  The parties later voluntarily dismissed DHS Director Alba Martinez, who had been sued only in her official capacity.  (Stipulation & Order, Feb. 4, 2004.)

in February 2005, bringing § 1983, conspiracy, wrongful death and survival action claims against the City and Maiden.  (*See* Second Am. Compl.)  The Bennett sisters' case was removed from suspense in July 2005.  The Court ordered that the Estate's case be tried simultaneously with the Bennett sisters' case.  (Order ¶ 2, Apr. 6, 2005.)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party makes such a demonstration, then the burden shifts to the nonmovant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial. *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

When evaluating a motion brought under Rule 56(c), a court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  A court, however, must avoid making credibility determinations or weighing the evidence in ruling on summary judgment. *Reeves v. Sanderson*

*Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).


## III.    DISCUSSION

Plaintiffs' § 1983 and *Monell* claims related to closure of DHS' Bennett file are premised on DHS' alleged misrepresentation that the Bennetts could not be located, which Plaintiffs claim resulted in the family court's discharge of DHS supervision and Aliyaha's dependency petition.[8] (Pls.' Mem. at 35-36; Estate's Mem. at 30 n.11.)  According to Plaintiffs, DHS' misrepresentation deprived the Bennetts of their substantive due process right to bodily integrity by allowing them to be abused by unfit care givers.  (Pls.' Mem. at 35-36.)  Plaintiffs' claims against the City are based on: (1) "DHS custom and practice of closing files for missing supervised families regardless of the risk posed to the children or the inadequacy of search efforts;" and (2) DHS' failure "to train social workers to locate missing families and assess whether missing families can be located."[9]  (*Id.* at 46-

_____

[8] Although the Estate's pleadings characterize its claim as resting on DHS' inadequate search and premature closure of the Bennett file rather than on DHS' misrepresentation of its ability to locate the Bennetts, the Court treats the claim as the latter.  (Second Am. Compl. ¶¶ 41, 42, 44; Estate's Mem. 30-33, 52-55.)  In its response to the City's motion for summary judgment, the Estate fully adopts the arguments of the Bennett sisters.  (Estate's Mem. at 30 n.12 ("Plaintiff's argument herein is to be considered supplemental to the siblings' Response."), 52 n.17.)  The Bennett sisters do not claim that DHS' search serves as the basis for the alleged constitutional violation.  (*See* R. at 22.)

[9] On March 6, 2006, after they filed a response to the City's motion for summary judgment, the Bennett sisters filed a motion to amend their Complaint to adopt the Estate's civil rights and conspiracy claims against the City and Maiden arising from the response to the August 14, 2003 hotline report.  (*See* Pls.' Mot. to Amend. Compl.)  The decision to grant or deny a motion for leave to amend a pleading is within a district court's discretion.  *In re: Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *Freedom Int'l Trucks, Inc. of N.J. v. Eagle Enters., Inc.*, 182 F.R.D. 172, 174 (E.D. Pa. 1998) (*citing Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971)).  Leave to amend "shall be freely given

47.)

The Estate also asserts § 1983 claims against the City and Maiden based on Maiden's failure to contact Porchia within twenty-four hours, as required by state law and DHS policy.  (Estate's Mem. at 15.)  The Estate asserts that: (1) Maiden's failure to comply with statutory requirements was "wholly arbitrary and capricious in violation of due process;" (2) "the statutory provisions requiring that Maiden make contact with Porchia Bennett within twenty-four (24) hours created a liberty interest protected by the due process clause and imposed an affirmative duty on the government, and its agents, to make the appropriate risk assessment in order to protect the well-being of endangered children;" and (3) "under the State Created Danger theory of liability . . . Maiden is liable for violating the Plaintiff's Due Process rights."  (*Id*. at 15-16.)  The Estate's claims against the City allege that: (1) DHS policy increased the risk of danger to Porchia because it did not require a social worker to confer with a supervisor to ensure initial contact was made within twenty-four hours of a hotline report; and (2) the moving force behind the violation of Porchia's rights was DHS' practice of miscoding hotline reports that describe abuse as if they only involve neglect.  (*Id*. at 29-30, 33-36.)

The City counters that Plaintiffs do not have sufficient evidence to establish that their constitutional rights were violated or that the alleged violations are attributable to a municipal policy or practice.  (City's Mem. at 1-2.)  Maiden claims the Estate has no legal basis for holding him civilly liable.  (Maiden Mem. at 2.)

To establish liability under § 1983, Plaintiffs must show that they suffered a constitutional

---

when justice so requires."  FED. R. CIV. P. 15(a).  A court need not grant leave to amend under circumstances of undue delay, bad faith, prejudice to the opposing party, or futility of the amendment.  *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).  Here, amendment would be futile, and therefore the Court denies leave to amend.

violation committed by a person acting under color of state law.[10]  *See Rivas v. City of Passaic*, 365 F.3d 181, 194-95 (3d Cir. 2004) ("The threshold issue in any Section 1983 lawsuit is whether the plaintiff has sufficiently alleged the deprivation of a constitutional right.  Because Section 1983 does not create any substantive rights, the plaintiff must be able to point to an independent constitutional or statutory right.").  For the City to be held liable, Plaintiffs must show that the constitutional violation occurred pursuant to a municipal custom or policy.  *See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).[11]

## A.    The State-Created Danger Doctrine

The state-created danger doctrine has its origin in dicta from the *DeShaney* decision, in which the Supreme Court set forth the general rule of governmental non-liability under § 1983 for harm to citizens by third parties.  *See DeShaney*, 489 U.S. at 197 ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.").  In

---

[10] Section 1983 reads, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .
42 U.S.C. § 1983 (2006).

[11] In *Monell*, the Supreme Court held that:
[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.
436 U.S. at 690.

14

*DeShaney*, the Supreme Court held that a county's child protection agency could not be held liable under § 1983 for failing to protect a child from abuse by his father. *Id*. at 203. The Supreme Court reasoned that "while the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *Id*. at 201. The Court also noted that the state "placed [the child] in no worse position than that in which he would have been had it not acted at all." *Id*.

The Third Circuit recognizes a § 1983 cause of action stemming from a state-created danger. *See Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). To establish a claim based on the state-created danger doctrine, a plaintiff must satisfy the following elements: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders plaintiff a foreseeable victim; and (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted).

As discussed below, viewing the evidence and all inferences therefrom in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have failed to meet their burden of establishing a genuine issue of material fact with regard to the fourth element of their state-created danger claims. The Court's resolution of the fourth element with respect to both the DHS discharge and hotline response claims eliminates the need for the Court to consider the other three elements.

### 1.   Discharge of DHS Supervision and Aliyaha's Dependency Petition

Plaintiffs contend that DHS obtained discharge of supervision and Aliyaha's dependency petition by misrepresenting that the Bennett family could not be located. (Pls.' Mem. at 16.)

Plaintiffs argue such a representation was false because social worker Dejesus knew that Tiffany Bennett was receiving DPA benefits in Philadelphia and therefore that she could be located. (*Id*. at 13.) Furthermore, according to Plaintiffs, if Dejesus had conducted even a cursory investigation then she would have located Tiffany Bennett. (*Id*. at 14, 20.)  Plaintiffs assert that DHS' discharge through misrepresentation led to a state-created danger because it was an act using state authority that made the Bennett sisters more vulnerable to third-party harm. (*Id*. at 35.)  They characterize the discharge as an affirmative act that placed the children in a worse position than if DHS had maintained the status quo of an active case. (*Id*. at 44.)  Plaintiffs claim this affirmative act foreclosed the possibility of future rescue by DHS and by child advocate social workers. (*Id*. at 20, 44 n.29, 45; R. at 25-26.)

The Court finds that DHS' misrepresentation and the subsequent discharge of supervision and Aliyaha's dependency petition did not violate the Bennett sisters' substantive due process rights by making them more vulnerable to danger from inappropriate care givers than if DHS had not acted at all. *See Phila. Police & Fire Assoc. for Handicapped Children, Inc., v. City of Phila.*, 874 F.2d 156, 168 (3d Cir. 1989) (concluding no substantive due process violation when "the retraction of state intervention permits the harm, but the harm [ ] actively is caused by a source other than the state.").  First, assuming that DHS misrepresented that the Bennett family could not be located, such a misrepresentation did not create the danger to the Bennett sisters. *See Forrester v. Bass*, 397 F.3d 1047, 1058 (8th Cir. 2005) (finding that social workers' filing of child danger/family assessment report containing material omissions and false representations was not act of affirmative endangerment because it did not create greater risk to children than they originally faced).  The discharge of DHS supervision and the inadequate search for the Bennett sisters did not create the

danger either.  The source of the danger to the Bennett sisters was their mother and the people with whom she chose to leave her children.

Second, although the City knew of the danger faced by the Bennett sisters, this knowledge does not give rise to § 1983 liability.  *See DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . ."); *see also Jones v. City of Phila.*, 185 F. Supp. 2d 413, 415 (E.D. Pa. 2001) (dismissing § 1983 claim based on allegations that police passively watched robbery and sexual assault and failed to intervene or arrest perpetrators).

Third, the failure to conduct an adequate search for Tiffany Bennett does not support § 1983 liability because the City had no constitutional duty to rescue the Bennett sisters from their mother. *See DeShaney*, 489 U.S. at 196 (The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual."); *Brown*, 318 F.3d at 478 ("[B]ecause the Due Process Clause does not require the State to provide rescue services, it follows that we cannot interpret the clause so as to place an affirmative obligation on the State to provide competent rescue services if it chooses to provide them.").

Fourth, discharging the Bennett case did not place the Bennett sisters in a worse position than the status quo of an active DHS case because the status quo consisted of an inadequate search by DHS.  Both an inadequate search and no search left the Bennett sisters at the mercy of their mother's care.  The case discharge did not render the Bennett sisters "more vulnerable to injury from another source than [they] would have been in the absence of state intervention." *Scheiber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003).

17

Finally, the Court finds that DHS did not prevent a private source of aid from reaching the Bennett sisters.  In *Kneipp v. Tedder,* the police stopped an inebriated Samantha Kneipp and her husband for causing a disturbance as they walked home along a highway on a cold night.  *Kneipp*, 95 F.3d at 1201.  Samantha "smelled of urine, staggered when she walked and, at times, was unable to walk without assistance."  *Id*.  The police allowed her husband to proceed without her, and he assumed they would take care of Samantha by sending her to a hospital or police station.  *Id*. at 1202. Instead, the police sent her home alone.  *Id*.  Later that night, Samantha was found unconscious at the bottom of an embankment, having suffered permanent brain damage as a result of the cold.  *Id*. at 1203.  Had the police not intervened, Samantha's husband, her "private source of rescue," would not have left her behind because he thought she obviously needed assistance to walk.  *Id*. at 1202, 1202 n.9.  The Third Circuit decided that a reasonable jury could find that affirmative action by the police increased the risk of the harm that Samantha ultimately suffered.  *Id*. at 1201.  The court held that the plaintiff stated a prima facie case under the state-created danger doctrine because "danger was created when Samantha was separated from her private source of rescue and subsequently abandoned by the police."  *Id*. at 1202, 1202 n.9.  The discharge of DHS supervision and Aliyaha's dependency petition did not similarly strip the Bennett sisters of a private source of aid.  Rather, the discharge officially ended DHS' search for Tiffany Bennett and her children.

Plaintiffs also claim that DHS' discharge foreclosed the Child Advocate Unit's social workers from looking for the Bennetts. (Pls.' Mem. at 20 (*citing* Anthony Tunnell Dep.).) However, according to Anthony Tunnell, who was the child advocate attorney charged with representing the Bennett children's interest at the April 18, 2000 family court hearing, the child advocate social

worker assigned to the Bennett case was likely involved in the decision to discharge the case.[12] (Pls.'

Mem. Ex. 45 at 17-18, 44-46.)  According to Tunnell:

> The child advocate social worker usually is the one who is in contact with the
> DHS social worker. Those two would talk about what efforts were made if the
> child advocate social worker was also going to go out and make some effort to try
> to find the children . . . . After they talk then they would very usually come to
> some kind of agreement or disagreement on whether the case should be closed or
> not.  As a rule, especial [sic] in a case where it's very unlikely that the attorney
> would have any contact with the client . . . the attorney would weigh heavily on
> the recommendation by the child advocate social worker . . . . When I was - if I
> were in court and on the list [to staff the courtroom], what I did would be based
> probably on what the child advocate social worker who was assigned to the case
> and the assigned attorney had instructed me to do.

(*Id*. at 17-18.)  If any child advocate social worker searched for Tiffany Bennett during the ten

months she was considered missing, then the search was unsuccessful.  (*Id*. at 36, 49.)  The Court

concludes Plaintiffs' assertion that DHS' case closure prevented a Child Advocate Unit social

worker from looking for the Bennett family is unfounded.

For these reasons, the Court finds that Plaintiffs have failed to demonstrate a material issue

of fact that the City used its authority to create an opportunity for the Bennett sisters to be abused

that would not have existed absent DHS intervention.  Because Plaintiffs have not established a

constitutional violation, their municipal liability claims also fail.  *See Brown*, 318 F.3d at 482

(Municipal liability requires a constitutional violation caused by an action taken pursuant to

municipal custom or policy.).

### 2.    Response to the Hotline Report

Turning to the second state-created danger claim in these cases, the Estate contends that

---

[12] The actual activities of the Child Advocate Unit lawyer and social worker assigned to
the Bennett case are unknown because the file is unavailable and Mr. Tunnell has no independent
recollection of the case.  (Pls.' Mem. Ex. 45 (Tunnell Dep.) at 52.)

Maiden's failure to respond properly to the hotline report of August 14, 2003, was an arbitrary and capricious act that violated Porchia's liberty interest in being contacted and given an appropriate risk assessment within twenty-four hours, as required by state law.  (Estate's Mem. at 14.)  As discussed below, viewing the evidence and all inferences therefrom in the light most favorable to the Estate, the Court finds that the fourth element of this state-created danger claim is not satisfied.  The Estate has not demonstrated a material issue of fact that Maiden created an opportunity for Porchia to be harmed that otherwise would not have existed.

The facts on record suggest that Maiden made no effort to respond to the hotline report, and then he lied about this.  (*See* Estate's Mem. at 8-11; City's Mem. at 9 n.6.)  When pressed at oral argument to identify an affirmative act by Maiden that created a danger to Porchia, counsel for the Estate pointed to Maiden's (1) "affirmative decision that he was not going to act in accordance with DHS policies and procedures and state statute;" (2) his affirmative decision not to go to the Bennetts' address; (3) and his "affirmative decision to lie about it."  (R. at 15-16.)  The Court concludes that the first two "affirmative decisions" represent inaction couched in terms of affirmative acts.  Maiden's lies and his failure to investigate the hotline report were not affirmative acts that placed Porchia in greater danger than she otherwise would have been.  *See Hansell v. City of Atlantic City*, 152 F. Supp. 2d 589, 605 (D.N.J. 2001) (granting summary judgment on state-created danger claim that police failure to investigate complaints of domestic violence enhanced attacker's feeling of invulnerability because no affirmative conduct by police placed plaintiffs in greater danger).  Maiden's failure to respond to the report may have been incompetent and unconscionable, but his failure does not give rise to a due process violation because "indefensible passivity" and nonfeasance do not amount to a constitutional violation.  *See D.R. v. Middle Bucks Area Vocational Technical*

20

*Sch.*, 972 F.2d 1364, 1376 (3d Cir. 1992); *see also Bright*, 443 F.3d at 282 ("It is misuse of state authority, rather than failure to use it, that can violate the Due Process Clause."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("[T]here is no constitutional right to be protected by the state against being murdered by criminals or madmen.  It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment . . . .").

The Estate argues its § 1983 claim against Maiden avoids the *DeShaney* rule of governmental non-liability for third-party harm because Pennsylvania's Child Protective Services Law ("CPSL") required Maiden to make contact with the Bennetts and make a risk assessment within twenty-four hours of the hotline report.[13]   (Estate's Mem. in Opp'n to Def. Maiden's Mot. for Summ. J.

---

[13] The Estate identifies the following statutes as giving rise to mandatory duties for DHS and liberty interests for Porchia:

(1) 55 PA. CONS. STAT. § 3490.53 (2006):
    (a) The county agency is the sole civil agency responsible for receiving and investigating reports of child abuse except reports of abuse allegedly perpetrated by an agent. The county agency shall investigate allegations of abuse of children residing in facilities operated directly by the Department.
    (b) The county agency shall protect the safety of the subject child and other children in the home or facility and shall provide or arrange appropriate services when necessary during the investigation period.
    (c) The county agency shall determine the status of reports of suspected child abuse.
    (d) If the county agency concludes that the child is in danger of further child abuse, the county agency shall do the following:
    (1) Accept the case for service.
    (2) Provide direct case management.
    (3) Monitor the provision of services, whether provided directly by the county agency or through purchase or agreement.

(2) 55 PA. CONS. STAT. § 3490.55:

    (a) Except as provided in subsection (b), the county agency shall begin its investigation within 24 hours of receiving a report of suspected child abuse. Upon beginning its investigation, the county agency shall see the child within 24 hours of receipt of the report.

[hereinafter Estate's Mem. Re: Maiden] at 11, 14-15.)  The Estate suggests that:

> [A]s opposed to the approach taken by the majority of the Court in *DeShaney*, in order to establish a due process violation you don't need to determine if there is a constitutional right to protection; instead, you must determine if Maiden's decision not to make contact with Portia Bennett within twenty-four (24) hours, as required by Pennsylvania Law, was arbitrary in the constitutional sense.

(*Id*. at 20.)

Contrary to the Estate's arguments, the mandatory procedures set forth in the CPSL do not change this Court's analysis under the state-created danger doctrine, and the Estate's substantive due process claim based on the violation of state statutory duties is not viable.  *See Forrester*, 397 F.3d at 1057-58 (8th Cir. 2005) (upholding grant of summary judgment on state-created danger claim that alleged social workers' failure to comply with state protective procedures increased children's vulnerability to continued abuse and deprived them of critical social services); *see also Doe v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir. 1990) (upholding dismissal by district court because *DeShaney* squarely bars substantive due process claim based on liberty interest in having county's

---

> (b) The county agency shall begin the investigation immediately upon receipt of a report of suspected child abuse and see the child immediately if one of the following applies:
> (1) Emergency protective custody has been taken or is needed.
> (2) It cannot be determined from the report whether or not emergency protective custody is needed.

(3) 55 PA. CONS. STAT. § 3490.321(g):

> At the time of the report of suspected child abuse or allegations of children in need of general protective services, the county agency shall make an initial determination of the risk to the child.

(4) 55 PA. CONS. STAT. § 3490.322(a):

> Each county agency shall implement a State-approved risk assessment process in performance of its duties under sections 6362 and 6375 of the CPSL (relating to responsibilities of county agency for child protective services; and county agency requirements for general protective services) and this chapter.

department of social services investigate and protect against child abuse pursuant to state statutory requirements).  The Third Circuit noted that the impact of the *DeShaney* decision "distinguishing between affirmative duties of care and protection imposed by a state on its agents and constitutional duties to protect" means "we can no longer rely on the statutory and common law duties imposed in Pennsylvania" as the basis of a constitutional duty to protect citizens from third-party harm. *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 723 (3d Cir. 1989).

In *D.R. v. Middle Bucks Area Vocational Technical School*, plaintiff students alleged that a school and its employees knew about the verbal, physical and sexual abuse they suffered at the hands of other students, and the school had a lax policy that encouraged such behavior.  972 F.2d 1364, 1367 (3d Cir. 1992).  The plaintiffs' state-created danger claim asserted in part that the school and its employees increased the students' risk of harm by failing to report the abuse to parents or the authorities, as required by 23 PA. CONS. STAT. § 6311 (2005).  *Id.* at 1375.  The Third Circuit rejected this claim, stating:

> [A] violation of a state law duty, by itself, is insufficient to state a § 1983 claim. Section 1983 liability arises only from a violation of federal statutory or constitutional rights under color of state law.  Thus, "illegality under the state statute can neither add to nor subtract from [the] constitutional validity [of a state's actions]."

*Id.* at 1375-76 (*quoting Archie v. City of Racine*, 847 F.2d 1211, 1216 (7th Cir. 1988)) (internal citations omitted).

In *Sayles v. Pennsylvania Department of Public Welfare*, a court facing a claim similar to the Estate's held that if the Department of Public Welfare "failed to act in accordance with the CPSL, such a failure to protect a child would not constitute a deprivation of liberty."  24 F. Supp. 2d 393, 397 (W.D. Pa. 1997) (granting motion to dismiss § 1983 claims).  The *Sayles* plaintiffs argued that

23

pursuant to the CPSL defendants Monroe County and Monroe County Children and Youth Services were required to protect foster care children from abuse and neglect. *Id*. at 394. The plaintiffs asserted that the defendants' failure to fulfill this mandatory duty resulted in the death of their daughter/granddaughter, who had voluntarily been placed in foster care. *Id*. As the Estate argues here, the *Sayles* plaintiffs argued that their due process claim avoided the *DeShaney* holding because legislative mandate created a special relationship and imposed upon defendants an affirmative duty to investigate reports of child abuse and to protect children from private harms. *Id*. at 396. The court rejected this argument and held that the mandatory language of the CPSL, which requires the Department of Public Welfare to respond to reports of child abuse immediately, does not give rise to an affirmative constitutional duty of the Department to protect a child from private harms. *Id*. at 397-98.

The Estate does not satisfy the fourth element of its state-created danger claim, and thus its claim against Maiden and the City based on the hotline report response fails as a matter of law. Because the Estate has not established a constitutional violation, municipal liability cannot exist. *See Brown*, 318 F.3d at 482.

## B.   Conspiracy

The Estate also brings a § 1983 conspiracy claim alleging that the City and Maiden conspired to cover up Maiden's failure to respond to the August 14, 2003 hotline report.[14]   (Estate's Mem. at 56; R. at 29.) Allegedly, the conspiracy arose in order to avoid civil liability for Porchia's death, and

---

[14] In its Complaint, the Estate described the conspiracy as an agreement "to inadequately investigate, report and/or document allegations of child abuse and to ignore allegations of child abuse." (Second Am. Compl. ¶ 62.)

it violated the Estate's right to meaningful access to the courts.  (Estate's Mem. at 57; R. at 30.)

According to the Estate, although the cover-up "didn't cause the harm of Porchia being murdered

. . . . What it did is cause delay, it caused the injury of having a stale case."  (R. at 31.)

To prevail on a § 1983 conspiracy claim, a plaintiff must show that two or more people acting

under color of state law conspired to violate her federal rights.  *Ridgewood Bd. of Educ. v. N.E. for

M.E.*, 172 F.3d 238, 254 (3d Cir. 1999).  The Estate does not produce evidence that supports the

inference of a conspiracy.  (*See* Estate's Mem. at 56-58.)  The Estate's vague and unsubstantiated

allegations fail to create a genuine issue of material fact that a conspiracy existed.  Accordingly, the

Court also grants summary judgment to Defendants on the Estate's § 1983 conspiracy claim.

### C.    Wrongful Death and Survival Act Claims

Having dismissed Plaintiffs' federal claims, the Court chooses to exercise supplemental

jurisdiction and rule on the pendant state claims out of respect for "judicial economy, convenience

and fairness to the parties."  *Bright*, 443 F.3d at 286 (*quoting Borough of West Mifflin v. Lancaster*,

45 F.3d 780, 788 (3d Cir. 1995)); s*ee also* 28 U.S.C. § 1367(c)(3) (2006) (district court may decline

to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been

dismissed).

The Estate brings wrongful death and survival act claims against the City and Maiden.

Defendants argue that Pennsylvania's Political Subdivision Tort Claims Act ("the Act") shields them

from such tort liability.  (City's Mem. at 39; Maiden's Mem. at 11.)  *See also* 42 PA. CONS. STAT.

§§ 8541-64, § 8541 (2005) ("Except as otherwise provided in this subchapter, no local agency shall

be liable for any damages on account of any injury to a person or property caused by any act of the

local agency or an employee thereof or any other person."). The Act shields the City in this case.

The Estate counters that Maiden abrogated this immunity through willful misconduct. (Estate's Mem. Re: Maiden at 38.) The Act does not provide immunity for "damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. § 8550. Willful misconduct under Pennsylvania law is equivalent to an intentional tort, and "a plaintiff must establish that the actor desired to bring about the result that followed, or at least [that the result] was substantially certain to follow, i.e., specific intent," so that such desire can be implied. *Robbins v. Cumberland County Children & Youth Servs.*, 802 A.2d 1239, 1253 (Pa. Commw. Ct. 2003). The Estate does not assert that Maiden had a specific intent to bring about the Bennetts' continued abuse or Porchia's death. (Estate's Mem. Re: Maiden at 38.) The Estate instead claims that a reasonable jury could find that Maiden was aware that continued abuse was substantially certain to follow from his deliberate failure to investigate the hotline report. (*Id.*)

Based upon the evidence presented, the Court concludes that the Estate has failed to demonstrate a material issue of fact that Maiden's failure to respond to the hotline report constituted willful misconduct. *See Wade v. Pittsburgh*, 765 F.2d 405 (3d Cir. 1985) (allegations that defendant police officers committed assaults and abusive treatment against plaintiff constituted willful misconduct); *Copenhaver v. Borough of Bernville*, Civ. A. No. 02-8398, 2003 U.S. Dist. LEXIS 1315 (E.D. Pa. Jan. 9, 2003) (willful misconduct alleged when complaint stated policeman shot six bullets at dog that had growled and walked away from him, that was not harming anyone and that fell at first shot). Rather, Maiden's alleged behavior is best described as incompetence, negligence

and nonfeasance. *See Scott v. Willis*, 543 A.2d 165, 169 (Pa. Commw. Ct. 1988) (Section 8550 does not apply to wanton and reckless behavior or gross and culpable negligence because they are not the legal equivalent of willful and intentional conduct.).   Therefore, Maiden's immunity under the Act remains intact, and the Estate's wrongful death and survival act claims fail.

**IV.     CONCLUSION**

Government entities and their employees should be held accountable for incompetence, negligence and nonfeasance.  Courts, however, are not always the appropriate forum to redress such wrongdoing.  When tragic events occur, an alarmed citizenry and its representatives must respond to prevent similar tragedies in the future.  Here, this Court is without authority to hold DHS and its employees accountable or to achieve what Plaintiffs hope to accomplish.  Although this Court does not condone the many ways in which DHS failed to carry out its mission and failed to help the Bennett sisters, for the reasons set forth above, the Court grants summary judgment in both cases. All claims against Defendants are dismissed with prejudice, and an appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ALEXUS BENNETT,                              :
ALIYAHA BENNETT, and                         :        CIVIL ACTION
PRISCILLA BENNETT, Minors,                   :
by and through their Guardian,               :
JONATHAN IRVINE,                             :
               Plaintiffs,        :        No. 03-5685
      v.                                  :
                            :
CITY OF PHILADELPHIA,                        :
               Defendant.         :
_____:
                            :
THE ESTATE OF PORCHIA                        :
BENNETT, Decedent, by and through           :        CIVIL ACTION
the Administrator of the Estate,            :
THOMAS BRUNO, ESQ.,                          :
               Plaintiff,          :        No. 05-0833
      v.                                  :
                            :
CITY OF PHILADELPHIA and                     :
JOE MAIDEN,                                  :
              Defendants.         :

<u>**ORDER**</u>

     **AND NOW**, this **17th** day of **May**, **2006**, upon consideration of the City of Philadelphia's and

Joe Maiden's motions for summary judgment on all claims, Plaintiffs' responses thereto, and for the

foregoing reasons, it is hereby **ORDERED** that:

        1.    Defendant City of Philadelphia's motions (Document No. 35 of Civ. A. No. 03-5685

              & Document No. 31 of Civ. A. No. 05-0833) are **GRANTED**.

        2.    Defendant Maiden's motion (Document No. 30 of Civ. A. No. 05-0833) is

              **GRANTED**.

        3.    Plaintiffs' motion to amend (Document No. 44 of Civ. A. No. 03-5685) is **DENIED**.

4.      The Clerk of Court is directed to close both cases.

BY THE COURT:

**Berle M. Schiller, J.**